[Civ. No. 16652. Second Dist., Div. One. June 17, 1949.]

BONNIE LYON et al., Appellants, v. CITY OF LONG BEACH et al., Defendants; VEARL SHAVER, Respondent.

■■■■■■

Bauder, Veatch & W. I. Gilbert for Appellants.

Joseph A. Ball for Respondent.

WHITE, P. J.—This is an appeal from a judgment in favor of defendant Vearl Shaver, entered upon the verdict of a jury, in an action for damages for the wrongful death of Henry Lyon, who was killed in an accident in the city of Long Beach, California, on or about May 31, 1943. The decedent sustained his fatal injuries when the station wagon owned and operated by defendant Vearl Shaver, and in which decedent was riding, struck a concrete retaining wall during a wartime "dim-out."

The action was originally directed against the city of Long Beach and various public officials, as well as defendant Shaver, charging the city and officials with negligence in the erection and maintenance of the retaining wall. The action ultimately proceeded to trial against defendant Shaver (hereinafter referred to as defendant or respondent) alone.

Defendant was employed at the plant of Douglas Aircraft Company in Long Beach. He made a practice of carrying fellow employees for a consideration from the vicinity of his home in La Verne to the plant and back. The decedent, Lyon, was also a Douglas employee and had been a rider in defendant's station wagon for about four months before the accident. The amount charged his riders by defendant was based upon

the cost of operation and maintenance of his vehicle in making six round trips per week, traveling an estimated 100 miles per round trip.

On the evening of May 31, 1943, defendant picked up four passengers, including the decedent, and drove to the Douglas plant where they all were to report for work at midnight. They reached the plant a little early. Two of the passengers alighted. Defendant, a Miss Anderson and decedent proceeded in the station wagon to a café for the purpose of getting some coffee. The café being too crowded, they drove to another. It was while they were returning from the café to the Douglas plant that the accident took place.

Plaintiffs contended that at the time of the accident decedent was a passenger for hire. The trial court ruled that as a matter of law the decedent was a guest and not a passenger at the time of the accident, and hence plaintiffs could not recover for negligence but only upon a showing of wilful misconduct (Veh. Code, § 403), there being no issue of intoxication involved. The jury was instructed accordingly.

Appellants in their brief state that they make no contention on this appeal that defendant was guilty of wilful misconduct. It is at least questionable whether a verdict based on wilful misconduct could be permitted to stand. At any rate, this question has been determined by the jury, under admittedly proper instructions, adversely to appellants.

There is no question but that the status of decedent Lyon was that of a passenger during the trip between his home and the plant. The trial court was of the view that this status ceased when the party arrived at the plant, and then embarked on an independent journey for a social purpose. The question therefore directly presented is whether, viewing the evidence in the light most favorable to plaintiffs, it affords any support for a finding, had such finding been made by the jury, that decedent's status was that of a passenger at the time of the accident.

Appellants take the position that the jury might have inferred from the evidence either (1) that decedent was a passenger for the reason that a tangible benefit was being conferred upon defendant at the time of the accident, in that it was to his business advantage to maintain the good will of his riders who wanted to go to a restaurant, or (2), that the contract of carriage included the side trip in question, claiming that "the evidence would have justified an inference that the transportation agreement was broad enough to in-

clude the trip from decedent's home until he was finally deposited at his place of employment."

Defendant testified under section 2055 of the Code of Civil Procedure:

Lyon had been riding with him approximately four months. Two or three times when his station wagon was not available defendant had ridden in Lyon's car. Defendant at times hauled as many as seven or eight people to work at a time, but the number varied, sometimes four, sometimes seven. He charged his riders "approximately all the same . . . around two or two and a half" per week. "I would get what they could put in a week to help out expenses." He did not know exactly how much he spent for gas and oil. He drove about 100 miles per day, from his home to the plant and back. His mileage was about 12 to 13 miles per gallon. He figured it cost him $16 per week for gas, oil and maintenance. He did not receive enough from his riders to take care of the payments on the vehicle. He later testified that the amount charged would vary according to the expenses and according to the number of riders—that is, the more riders the less the charge per rider.

Upon returning to the stand after a recess and under examination by his own attorney, Mr. Shaver testified that he did not collect the same amount from each rider each week, but "what my expenses would run. Why, on the wagon, four riding or seven riding, I would figure it up, the percentage on it, or what it would cost for that amount of riders I had. Q. Was it a cheaper amount each week than if four rode? A. Yes." Again he testified:

"Q. In figuring the amount . . . you knew the exact number of miles you drove each day? A. Yes, sir. Checked it lots of times. Q. Was there an exact number of miles you had figured that went into that computation? A. *I figured about what it cost me in gas.* Q. *No, your mileage, what was the mileage* you figured for these riders? A. *At the time I picked them up into the Long Beach plant and back to my home, was 100 miles, a mile or two over.* . . . I checked it on my speedometer."

Under examination by the court, the witness testified: "THE COURT: Well, is this correct; you charged $2.00 or $2.50 per week for a passenger whether you carried three or eight? A. If I had around three or four it would be more. If I had eight it would be less a person. THE COURT: Did it always vary between two and two and a half a week? A. Yes,

sir. THE COURT: If you had three, how much did you charge? A. What my expense would be for a week for gas. THE COURT: If you had eight, how much did you charge? A. I don't recall exactly what it would be. THE COURT: Did you keep any records? A. No, sir, only just figure up on the week, at the end of the week *what it cost us.* THE COURT: Ever charge any more than $2.50? A. No, sir. THE COURT: Ever charge any less than $2.00? A. Well, I'd say it would be—— THE COURT: Not what it would be. I want to know what you charged. A. When there are two and three and four riding, it would run more than that. THE COURT: Did you ever charge less than $2.00? A. Yes, sir. THE COURT: What is the least that you charged? A. Around— I don't know—— THE COURT: If you had eight riding—— A. It would be around maybe a dollar—something like that."

In his own defense Mr. Shaver testified as follows:

"Q. *In making your charges to your riders, did you charge any other mileage except from your home to the plant and back? A. No, I didn't. Q. Ever include in that mileage any side trips? A. No.*" He further testified that the use of the car during the day by his wife was not included in the charges; that the charge for gasoline was based on mileage and not on actual consumption; that if he had occasion to buy a tire, he would "more or less figure in the week as I go along, or next week"; he "added more onto one week, that week, and make it up in two weeks or three weeks, or something like that"; that if he had a "ring job" he would charge that to the riders, but would spread it out "add into weeks, the coming week."

The wife of defendant testified that she helped him "figure out the cost for the week"; that if there were eight riders the cost might be as low as $1.00 unless there were extra expenses, but she could not remember exactly; that they did not include depreciation; that they never asked for more than $2.50 per rider, but absorbed the extra expense if it could not be recovered over "a period of time."

Mr. Dempsey, one of defendant's riders, testified that his payments varied, depending on whether he had been riding with defendant or had furnished his own car to carry some of the defendant's passengers; that the payments varied from $1.00 to $2.50—then he testified that the lowest he paid— on a full load—was $1.50.

So far as the facts surrounding the decision to make the side trip for coffee are concerned, it appears that defendant

transported his riders, a Miss Anderson, the decedent and two others, to the parking lot across the road from the Douglas plant, parked his vehicle in its accustomed parking place and shut off his motor. Two riders alighted, leaving decedent, defendant and Miss Anderson in the vehicle. The decedent, who was sitting in the middle seat behind the front seat, suggested, "Let us go down to Long Beach and get us something to eat." The three drove to the "Bomb Shelter" café and entered the establishment, but left after a few minutes, as it was too crowded. "Q. Did somebody suggest going somewhere else? A. I don't recall. Q. Remember a conversation about that? A. No, sir, more than said 'Let us go'—something like that. . . . The first place we saw to eat we stopped."

It is conceded that so far as the daily trip to and from the Douglas plant is concerned, the relationship between defendant and his riders was that of carrier and passenger. Further, it cannot be denied that when the party arrived at the parking lot on the evening of the accident, the purpose of the transportation for which the decedent gave compensation had been accomplished, that is, he had been transported to his place of employment. As the undisputed facts show, two of the passengers had alighted and gone to work. The decedent, Miss Anderson and defendant then embarked upon an independent trip for a purely social purpose. It may be conceded that decedent contributed to the expense of the trip to the café, in the sense that his weekly payments to defendant included part of the expense of upkeep of the vehicle, such as tires and motor repairs, but it is settled that contribution toward the expenses of a ride taken for the mutual pleasure of the parties does not take the contributor out of the category of guest. (*Rogers* v. *Vreeland,* 16 Cal. App.2d 364 [60 P.2d 585]; *McCann* v. *Hoffman,* 9 Cal.2d 279, 286 [70 P.2d 909].) As was said in the last cited case:

"Therefore, where a *special tangible benefit* to the defendant was the *motivating influence* for furnishing the transportation, compensation may be said to have been given. But it is not given where the *main purpose* of the trip is the joint pleasure of the participants. The payment of a portion of the expense, as for gasoline and oil consumed on the trip, is merely incidental, and does not constitute the *moving influence* for the transportation. The provocation for the offer of transportation remains the joint social one of reciprocal hospitality or pleasure." (Emphasis added.)

We cannot adopt appellants' view that the evidence would have justified an inference that the transportation agreement was broad enough to cover the trip in question. Appellants claim that it could be inferred that the agreement was broad enough to include the trip from decedent's home *"until he was finally deposited at his place of employment."* The uncontradicted evidence shows that decedent was in fact "deposited" at the usual terminus, the parking lot, the automobile was parked in its usual place and the engine shut off, and two of the passengers alighted and went to work. We see no escape from the conclusion that the contract of carriage had been fully performed at the time the decedent suggested that they "go down to Long Beach and get us something to eat."

It is urged by appellants that "a tangible benefit" was being conferred upon defendant, in that the "motivating influence" for the defendant's driving decedent to a restaurant was personal gain in retaining the good will of decedent and his continued patronage as a rider. In this respect it is argued:

". . . The respondent, except for the fact that he was working in a war plant and carrying riders, was getting only the 'A' coupon. . . . Even assuming that the story told by the survivors was true, it does not take much in the way of mental gymnastics to reach the conclusion that, when the respondent was confronted with the request that a cup of coffee or a bite to eat be obtained before proceeding to work, he concluded that it would be to *his benefit* to maintain the good will of the decedent and the others who wanted to participate in the food, by driving them to the restaurant. It is a matter of common knowledge that extra gasoline was allotted to war-time workers who used their cars to transport themselves and others to and from the various war plants. It was essential to the respondent that he maintain at all times the good will of his passengers, so that he could himself obtain the extra gasoline which made it possible for him to travel the 100 miles a day from his home to his place of employment."

The inference which appellants contend the jury could draw would be based, in our opinion, wholly upon conjecture. True, it was to defendant's advantage to have enough riders to qualify for a "B" or "C" gasoline ration book, but there is nothing in the testimony from which it could be inferred that these two riders, Miss Anderson and the decedent, were indispensable for that purpose. The defendant recovered his

expenses irrespective of the number of riders. The supposed benefit conferred upon defendant—the good will of the two riders—is not, under the facts of the instant case, such a tangible benefit as would constitute the riders as passengers at the time the accident happened.

The cases relied upon by appellants are, in our opinion, readily distinguishable from the situation presented in the case at bar. In *Kruzie* v. *Sanders*, 23 Cal.2d 237 [143 P.2d 704], the sole purpose of the plaintiff in riding with the defendant was to help the defendant select some Christmas gifts. In *Piercy* v. *Zeiss*, 8 Cal.App.2d 595 [47 P.2d 818], defendant drove the plaintiff home from work in the hope of selling her some insurance. In *Whittemore* v. *Lockheed Aircraft Corp.*, 51 Cal.App.2d 605 [125 P.2d 531], an official of an airline was to take delivery of a plane at Las Vegas, Nevada. Instead, however, he came to Burbank and boarded the plane for the flight from Burbank to Las Vegas, during which flight the plane crashed, resulting in his death. The court there said: "It is admitted that decedent did not *pay* anything for the ride, but defendant must be deemed to have received compensation if he was taken along because it was considered by defendant to be to its business advantage that he be taken to Las Vegas in the plane. . . ."

In the foregoing cases, a definite, substantial benefit was being conferred upon the defendant driver in connection with the trip during which the accident occurred. In *Whittemore* v. *Lockheed Aircraft Corp.*, *supra*, the trip was being made in pursuance of defendant's business. As the court said, "In its essential features the transaction was one in which defendant was promoting its own business interests." The case at bar presents no such situation. Defendant was not in the business of carrying passengers for profit. The possibility that he agreed to make the trip because he feared losing the good will of his two passengers is wholly speculative and conjectural; moreover, irrespective of what might have been the motives in defendant's mind, his act was an act of hospitality in connection with a trip undertaken for a purely social purpose and the mutual pleasure of the three people who had remained in the vehicle after the business trip had been concluded.

In their reply brief appellants for the first time urge that the trial court erred in refusing to permit cross-examination of defendant as to the custom of taking side trips on prior occasions. The contention cannot be sustained. At the

opening of the trial, plaintiffs' counsel examined defendant under section 2055 of the Code of Civil Procedure and asked the following question:

"Q. Now, when you would come to work with these people, had you on occasions before May 31, gone to get something to eat before you went on your shift?

"MR. BALL (Defendant's counsel): Object. That is immaterial.

"MR. GILBERT: I asked that in view of counsel's opening statement.

"THE COURT: I think there is no foundation now that it would make it material. Objection sustained *at this time* as to what was done upon previous occasions, without prejudice to bringing it up again if you think there is any foundation for it. I don't see any now."

Examination of the record discloses that the matter was never brought up again, although, as the foregoing quotation shows, the plaintiffs were not foreclosed from this line of inquiry by the court's ruling. Miss Anderson and Mr. Dempsey, both riders with defendant, testified at the trial, but no attempt was made to elicit from either of them any testimony relative to side trips or any custom that might have existed.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied July 5, 1949, and appellants' petition for a hearing by the Supreme Court was denied August 11, 1949. Gibson, C. J., and Carter, J., voted for a hearing.